Good morning, your honors. May it please the court, Brianna Fuller on behalf of Edward Valenzuela. The primary evidence in this case was a series of fingerprint cards. Cards were admitted not to prove the identity of the person fingerprinted on a particular day, but instead to prove that the person fingerprinted gave a particular name on that particular day. But neither the bare-bones FBI declaration nor the pattern and practice witness, who didn't start working at the agency until decades after the relevant events, were able to tell the story of what those fingerprint cards were and how they came to be. Aggravating this error was a misstatement of law by the prosecutor and a case agent who explicitly violated a court order carefully drawn by the district court. Our case law on the fingerprint cards, our case law is pretty clear that those cards are public records and they are self-authenticating and they come in and as public records, their contents can be revealed in evidence to the jury. Isn't that what the case law says? There are two differences between this case and Weiland and the other cases that this circuit has held. Weiland and Gilbert are the two. Weiland and Gilbert. The two differences are, one is that the reason that the fingerprint cards were being admitted here was not to prove the identity of the person that was present on a particular date. That was the case in Weiland. It is admissible under 404B to prove identity and knowledge, is it not? The question is, was your client using aliases and did he knowingly do so? And if he provided different names to different government agencies on the days that he was fingerprinted in the past, that's classic 404B evidence to show knowledge and identity. And that's the theory under which the government, I think the government tried to admit it as both direct evidence and as 404B. The problem, though, is... Well, there's no... I mean, 404B evidence can come in as direct evidence. It still has to meet the hearsay requirement, Your Honor. And the question here was, how did these names get on the fingerprint card? I agree that if... If it's a public record, that's an exception to the hearsay rule. And the content would not be hearsay because it was gathered in the course of a regularly conducted business activity on which the agency relies. If it's hearsay within hearsay, then the hearsay itself has to meet another exception. If the document is admissible as a public record and the state of the record is that the agency relies on the contents of those records in order to discharge its public duties, that is an exception to the hearsay rule. It's not hearsay within hearsay, it's an exception. The source of the information still has to be... has to be shown to be under a business duty or meet one of the other hearsay exceptions. And the other point we've made in our brief is that the name that is on the fingerprint card is not part of the record that the agency generally relies on to prove anything other than that there was some reason to think that that person is connected with that name. But the testimony was that the practice is to obtain the information at the time the prints are rolled, usually from the person that you're printing. Isn't that state of the record? And that was the problem... that's, I guess, the second part of the problem with the fingerprint cards, Your Honor. That testimony came through an agent who had not started working with that agency until more than two decades after the relevant events. I rolled my first set of prints when I was 15 years old. Those cards haven't changed in, I hate to tell you how many years. I mean, that goes to the weight, not to the admissibility of the evidence. That agent still has to have personal knowledge or some basis to testify, and he didn't... he just claimed that he had any basis to understand how these prints were taken. Did you introduce any evidence to show that the way in which those fingerprints were taken and the information was obtained is different today than it was at the time these prints were rolled? There was testimony from the marshal that said that in their practice was different, that their practice was to rely on the person who brought the body or to look it up on the database rather than to ask the person. And this is the crux of the matter. The government said that this evidence was admissible if he claimed that that was his name on that date. That's at Excerpts of Record 46. Unless there was testimony that linked up how this fingerprint card was made, then the fingerprint card was not relevant to prove that he was the person, that that information would have come from him. There's also evidence on the fingerprint cards themselves that suggests that there was some other manner of getting that information. For example, there was alternate spellings listed of the name. It's unlikely that a person would say, my name is Juan Manuel Aldea, but sometimes it's spelled this way. But all of these arguments go to, in essence, how reliable this evidence is for the jury's ultimate determination. Your challenge is to the admissibility of the underlying record. If we conclude as a matter of law in reliance on Gilbert and Wieland that the district court did not abuse its discretion in admitting this evidence, all the arguments that you've been making to me are ones that I would expect were made to the jury as to why they shouldn't believe that the aliases are attributable to Mr. Valenzuela or whoever he is. They were made to the jury, and that's, you know, the defense counsel tried to say that. But on the other hand, there was testimony from the agent who said, I can tell you how these things are made. This is how they're made. The problem is that he didn't have relevant information about when the processes of ICE, when the fingerprint cards were actually made. And I think that's the crux of the problem. There was nothing tying up how ICE would have done, or INS before ICE, would have done this. Wasn't there a group supervisor called who'd been with the agency since 96 who said that he'd done this hundreds of times? He had done it hundreds of times since 1996. Right. But the crucial fingerprint cards here were from 73 and 74. But I guess there's still no evidence that there had been any significant change in the way these public records were compiled. And I hate to go around in circles. I think the evidence that was there was that the marshals stating that there are other ways that these fingerprint cards are made, that they're not always made by simply asking the person what his name is. But the testimony was from people from Department of Homeland Security, and these were INS fingerprint cards. It was a person from ICE versus INS. That's correct. It's the successor agency. Exactly, Your Honor. I still think the difference is relevant because processes at the border change over time. They're not habits. You know, one of the treatises uses the example. When you do habit or pattern of practice testimony, it's one thing if you're asking the habit of a person, do they write with their left hand? That's not something that changes over time. Versus what time do they wake up in the morning? Then you need some testimony that's more relevant, closer to the time of the relevant evidence. This is more like, what time do you wake up in the morning? The practices at the border necessarily change over 25 years. As technology changes, as the flow of people change, as the laws change. For that reason, I don't think that you can say that a person who understood what the practice would have been in 1996 can testify to what that practice is in 72. Particularly when there's evidence that there are other ways to do it, and when there's other information on the card that suggests that the person there is using some other source of information to put markings on that card. These cards were littered with different handwriting, different typewriting, and there's no evidence here about how those various markings came to be, how the prints were taken, how they were indexed, who had their hands on them. And that's the essential problem with the fingerprint cards. Now, even if the fingerprint cards came in, it's a different question whether Agent Cecil should have been allowed to testify if he didn't have relevant information. So I think that's my argument on the fingerprint cards. But don't we still review for abuse of discretion? We do, Your Honor. Because it's a question of the admissibility of the evidence. Yes, Your Honor. But this was a preserved objection that would be subject to... No question about it. Okay. I'll speak real briefly about one of the points raised in a 28-J letter. The government states that the questions, because, again, it was not simply the biographical information that was objected to, but also the notations regarding deportation. I do want to point out that the government lately argues that this should be reviewed under plain error. This was something that was objected to pretrial. In excerpts of Record 1, there was an objection made to, you know, the defense counsel says, I believe that they're going to argue about what the nature of these various deportation notations means, and I'd like to object to that on relevance and foundation grounds. He did also get a ruling out of the court on that very issue on page 2 of the excerpts, which state that where the court says, well, if he wants to talk about the nature of the deportation voluntary removal, he can do that. He just can't talk about arrests. So I do believe that that was preserved pretrial. I'm happy to talk about the other two issues, but I might want to reserve the last five minutes unless the court has specific questions on those. Thank you. Thank you. Thank you. Good morning, Your Honors. Mark Yohalam on behalf of the United States. Also with me at counsel table is Peter Baldwin. He was supposed to be in trial today. His defendant has actually fled the country. So he's here if the court has any questions, but he did not prepare for this argument. So as a first line of defense, I'd prefer the court direct questions to me. Well, that's why we'll question him. He will be my human shield then, Your Honor. I want to start with the fingerprint cards and point out a few things. One is defense counsel says that there's no indication on the cards how the information was gathered. I strongly disagree with that. The relevant fingerprint cards, particularly the INS ones, all the ones that have a different name from defendant's name, all have a box that says signature of the individual being fingerprinted. Those signatures are all filled in, and the signatures are in the same name as the box that says name of the person being fingerprinted. It just doesn't make any sense to think that someone else would have signed that box unless you believe a years-long fraud spanning multiple agencies to falsely incriminate defendant for a crime he would be charged with 30 years later. I'm assuming that all of the cards were admitted into evidence, although in redacted form, and the jury had those cards before it. That's correct. So they could see whether or not there had been material changes in the cards over the 30-year period that we're talking about. That's correct, Your Honor. And so the four cards that are most significant are Exhibits 23B, C, D, and E. Those are excerpts of Record 618, 21, 24, and 27. And as I say, each of those is signed. And the INS ones are signed, have notations of the agency that took it, of which branch took it, of where it was taken, of who took it. It's signed by the person who took it. It's signed by the defendant in a false name. And so, you know, in the reply brief, defendant argues that these fingerprint cards are materially different from warrants of removal. But in fact, all the things that defendant argues makes warrants of removal so reliable, like the fact that they were created at the border, that the alien's signature and fingerprint is on it, that there's the signature of the official who took it, that there are notations of where it was taken. Those are all actually on these cards. It's true that there is one distinction, which I think is not a trivial one, which is that these are not part of an A file. Obviously, documents in an A file, I would say, do have a little bit more trustworthiness than documents that are not. But as Judge Tallman rightly pointed out, that's something that goes to weight. While I would agree that the cases Weiland and Gilbert are probably the two best cases in the sense that they're published cases, the Segundo and Diaz-Lopez cases, which are unpublished but citable, are just directly on point. And so I don't see how those could be distinguished. They don't bind the court, but I think that they're relevant and something that the court should look at. Turning, I guess, quickly turning to the testimony from Agent Ciesla, defense counsel, I think, is incorrect when she says that Agent Ciesla disclaimed knowing anything about the procedures in 1974. On cross-examination, and this is at ER 318, defense counsel says, what about in 1974, do you know the process? Agent Ciesla, it's substantially the same. Based on your training and experience, yes. Now, Agent Ciesla didn't just prepare cards post-1998 when he started at the agency. He also had an obligation to review cards, and he said he's reviewed over a thousand cards beyond those that he's prepared. Although this isn't actually in what it says, I think a fair inference to draw from that would be that some of those cards are going to predate 1998, and so he would familiarize himself with them. Judge Tallman points out they haven't changed substantially. The court can actually look. We have one new fingerprint card at ER 639 that was prepared in 2009, and you can compare that to the old ones. They're the same. They have the same boxes to fill out. Their layout has changed a very little bit, probably because they used to be prepared on some kind of manual printing press, and they're now being printed out as PDFs. But basically, they're the same. So, you know, all of this, maybe there were arguments to be made about weight, and those arguments were made extensively, both in the cross-examination of Agent Ciesla on pages 319 to 322, and in closing argument they were made to the jury at 538 to 39. Even assuming that Agent Ciesla's testimony should not have come in, but the cards should have come in, because they're presumptively trustworthy public records, there really would be no prejudice from Agent Ciesla's testimony, because the material information on the cards is self-explanatory. When you have a box that says, Signature of the Person Being Fingerprinted, a jury can figure out that's the signature of the person being fingerprinted, not the signature of a third party. And when there's a box that says, Disposition, and it says, Return to Mexico Airlift, Return to Custody of Mexican Immigration Authorities, a jury could easily figure out that that meant that the defendant had been deported, and draw the inference, which is the inference that the prosecutor argued, which is that an American citizen would not have permitted himself to be deported twice as an alien, if he knew that he were an American citizen. Certainly would not permit himself to be turned over to foreign immigration authorities under a false name. Defense counsel argued in her reply brief that the government has waived harmlessness with respect to this claim by not arguing it in the brief, and cites the clone case. The government did argue harmlessness in the brief. It didn't argue it with particularity towards each issue, but at pages 42 to 43 of the brief, the brief says, Even if errors did occur, they were not so prejudicial as to warrant reversal, because the evidence against the defendant was so strong, and any error was at most marginal. That distinguishes this case from the clone case, where the government didn't contend the error was harmless anywhere, there was no briefing on the issue by either party, the evidence was weak, there was a lengthy and complex record, none of the factors in clone that stopped this court from reaching harmlessness were present here. The government certainly doesn't think there was an error in letting in the testimony, but if there were, they would be harmless, given that the card should come in. If the court has any questions with respect to the other two issues, I'm certainly happy to address them. Do you have copies of the card? I have with me right here, I have some better copies of the exhibits that were used at trial. They're in the excerpts of record, but the copies there are not quite as clean. Why don't you pass them on? Should I show them to the film? I feel like I'm back in trial, We do occasionally step into the pit we shoot you. Yes, please. The exhibit labels are on the back of the cards. As I said before, it's B, C, D, and E, and particularly D and E I would say are the two most important ones. Here's B. Here's C. D. And E. And E is the 2009 version. I see here where it says rolled by Tallman. That was when he was 15 years old, Your Honor. Doesn't look like the cards have changed much. Let me just be clear. E is not the modern one. Those are the four historical ones. The modern one will be at the very end. So if you just go to the last exhibit. One other thing, just because I notice I have a little bit of time. I don't intend to use it all. I think Judge Gould has it. I apologize. I have a question for you. I'd like you to address, please, the denial of the motion for mistrial after the witness made the comment about alien smuggling, which seemed to be directly contrary to what he should have heard the district court say earlier. Yes, Your Honor. There is no question that he should not have given that answer. So I think it was entirely appropriate that there was an objection and that the answer was stricken. But the district court found that the witness was not deliberately trying to flout the pretrial order. That finding is at ER 335 to 336. And so what follows from that is the question, is a curative instruction sufficient? This court has said repeatedly that the preferred procedure is a curative instruction, not a mistrial. The mistrial is something that should be done only with the greatest of caution and is a rare exception. Here we have two curative instructions that are issued. One is immediately following the testimony, the judge says disregard that, you are not to consider it, and the answer is stricken. But the jury heard it. Absolutely. Did you caution the witness or whoever the trial attorney was before the witness went on the stand about blurting out that information? I was not at trial. I can ask Mr. Baldwin to answer that question. I will say that the witness was present when the judge issued its order. He was in the courtroom when the judge gave the order. There's no doubt that the witness knew about the order and should not have said that. And I make, as I say, entirely appropriate. That wasn't my question. My question was whether the attorney for the government, before calling that witness, reminded the witness of the court's admonition. Because, you know, from my experience, you get law enforcement officers on the stand, they always like to put this kind of stuff in. You know, it's just part of the game. Well, I will say, let me first let Mr. Baldwin answer your question and then I'll answer on the legal side. Sure. Your Honor, what happened with respect to this particular witness? And just to directly answer your question, the answer is no. I did not specifically speak to the witness before he took the stand to remind him of the court's order. Judge Tallman is correct. He was in the court the entire time. And what had happened, essentially just the timeline of events, the rulings on these pretrial motions were made and then we immediately started into the case. And this case agent was, I believe, the second witness. So we had immediately started in. There was no additional break right. Then went to him and said, Special Agent Bagot, be reminded of the court's order. So that did not, in fact, happen. But as Judge Tallman points out, he was, in fact, there for the entire proceedings. And he was aware of the ruling. And the order was directed towards him, in a sense. I think the order was directed towards anyone who would testify to those cards. And to the extent that he was going to be testifying to the cards, yes. And as Mr. Yallholm points out, it was a mistake. And he should not have said what he said. But, again, as Mr. Yallholm points out, the curative instruction was immediate. And my sense from being there is that it was as effective as it could have been. Well, you'll agree that was pretty damning evidence. Your Honor, I think I want to answer that in two ways. One is, I think it actually was not so bad. It certainly was prejudicial to some extent. But, you know, this was a defendant where already the cat was out of the bag that he had been removed from the United States twice. So it wasn't like alienage was being introduced for the first time. Because of the two fingerprint cards, Your Honor, just looked at. But alien smuggling is serious crime. To be sure, Your Honor. One of the things you asked was that sometimes law enforcement officers sort of like to just twist the knife. I think the record does not support that's what's going on here for the following reason. There were at least two other crimes. If they had wanted to sort of smear him by offering up some criminal history that they shouldn't have, they could have let out that one of his fingerprint cards was for forgery, which would be, I think, much more damning evidence here. And another arose from his arrest. Maybe they figured they did enough. Well, maybe. I mean, the other was that, you know, one of his arrests was more recent ones, was for really truly heinous crimes, an assault with a deadly weapon, sodomy on a child, kidnapping. I mean, so I just don't think the record supports and the finding made by the district court is directly the contrary, that this was anything intentional. So what you have is, you know, an accidental boneheaded by, I entirely agree, a boneheaded mistake, but not one that is so prejudicial as to require a mistrial, particularly when you sort of weigh. Counsel, if I could ask you a question. The judge made a finding that it wasn't intentional. But what did he base that on? Did he have a hearing? Was the witness examined by the court? No. In other words, what did he base his finding that it wasn't intentional on? You know, the record doesn't, he doesn't give a sort of written or lengthy explanation of why. I think the fair inference is that a judge who's in the courtroom is observing the demeanor of the witness. He's observing the demeanor of the prosecutor. He's observing both the witness and the prosecutor when this issue was raised during the break and basing it on that, sort of the totality of facts on that, things that unfortunately don't come through from the record as a printed word. And, well, best practices would be that the judge would make a sort of explicit lengthy explanation for why, but I certainly don't think that's required here. And, you know, while I recognize, as Judge Preggerson suggested, that alien smuggling is a serious crime, it is, you know, something that should be stricken. So it's got a pretty high minimum, too, hasn't it? I actually don't think so, Your Honor. I think if it's not done for profit, it's maybe one or two year minimum. And then if it's a family member that you're smuggling in, there's no minimum whatsoever. Although I'll defer to Ms. Fuller, who I think is an expert on immigration law much better than I am. You know, if you look at – there are other cases from this circuit where worse misstatements were made and a mistrial wasn't required, like the Higigi case. I think there – Well, you know, judges don't like to declare mistrials because they've got to try the case over again. You know, the calendars. That is true. And I think that's maybe one of the reasons why mistrials should be granted with the greatest of caution, is that it is a big expense to the whole judicial system. But we're interested in following the rules and justice, and we shouldn't have to worry about things like expense. I agree, but one of those rules is that mistrials should be declared with the greatest of caution. You know, that was a binding rule that was something that the district court had to follow. Who wrote that? It's the Escalante decision. I'm not sure which judge did. And I will – I'm not in the practice of naming judges and opinions. I've seen too many lawyers – That was a case that was on appeal from me. I recognized it after 30 years. And there was some mean-spirited statements said by one of our judges – a decent defense attorney who then went on to be a rather famous judge. Yeah, it's funny. I was looking at that last night at my law clerks here, and I said, go get me that Escalante case. Something rings a bell. And it was – what was it? 1880, huh? No, it was more than 30 years ago. 1980. 1980. I don't think so. It wasn't 1980. It was in the 18 – in the 80s. 1980, I was an old man. It was hard for me to remember things. Well, maybe I got it here. Let me see. I know it's here. 1980. Well, here it is. Escalante, 637 Fed Third, 1197. Ninth Circuit, 1980. Yes, Your Honor. It's not bad, you know. I'm embarrassed to admit that was the year I was born. I was not writing decisions at that stage. You weren't reading the slip sheets. Maybe my parents were reading them to me in utero, Your Honor. I do that to my daughter, actually. Well, I see the clock is counting up, so I will turn the lectern over to Ms. Fuller, unless the Court has further questions for me. No further questions. Thanks. Thank you. I'll make a couple quick points on the subject that we just left. My memory, although I couldn't confirm this right now, was that there was a lunch break, actually, between the motions in limine and when the testimony came out. So the testimony that went directly into and that there was no time to warn, I don't believe that's true. What I know not to be true is that, or what I am at least concerned about, is that the prosecutor did represent to the Court that he had warned the agent. It says, prior to his testimony, the agent was told that he was not to refer to any arrests or convictions, that he was only supposed to refer to them as government contacts. That sounds different than what we heard right now, and that's at Excerpts of Record 22. We still have a factual finding, do we not, from the district judge who was there, that it was not intentional. In fact, as I read the transcript, frankly, Mr. Baldwin's question wasn't very good, and that may have been part of the problem that elicited the response. I think that whatever the question was, this certainly wasn't called for by the question. The question was what was significant about the cards and what was significant to the government was that the two names were on there. The Court made a finding that the prosecutor and the prosecution did not act in bad faith. That's not specifically... The case agent is part of the prosecution team. I think that's a stretch to suggest that the Court's ruling doesn't encompass the conduct of the agent. It was your motion for mistrial that the Court was ruling on based on what the agent had said in response to Mr. Baldwin's question. I don't think he made a specific finding about the case agent, and I think if he made that finding having believed that the prosecutor had warned him, then that's a different story. Had he thought there was bad faith, he would have granted the motion and limited it. Well, he still could have believed that the curative instruction had cured it, I assume. Case law says if it's in bad faith, you've got to grant the motion. I admit that's true. But I would point out that this wasn't a typical case agent either. This was a case agent who had sent e-mails to the prosecution telling him how to fix certain problems in his case, that he gave very difficult answers to the questions that Defense Counsel was putting to him. So I think that even if it was just a marginal call, that this was the kind of case where there was a clear court order, the case agent certainly heard it was in the room, the Court was informed that he was told again before his testimony began, and the fact that he deliberately inserted it was a deliberate ignorance of what the ruling was. And again, this Court has said that this is a bell that's particularly difficult to unring, and for that reason, this Court should send this case back for a new trial. Is there other questions I'll submit?  No questions, sir. We thank both of you. The case was well argued and presented.
judges: Pregerson, Gould, Tallman